RENDERED: SEPTEMBER 26, 2019
TO BE PUBLISHED

# Supreme Court of Kentucky

2018-SC-000523-DGE



COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND FAMILY
SERVICES, and A.W.S., A CHILD

APPELLANTS

V.

ON REVIEW FROM COURT OF APPEALS
CASE NO. 2018-CA-000088-ME
KENTON FAMILY COURT NO. 17-AD-00116

K.S., MOTHER

APPELLEE

## OPINION OF THE COURT BY JUSTICE BUCKINGHAM

### REVERSING

The Kenton Family Court found K.S.'s son to be a neglected child and terminated K.S.'s parental rights.[1] K.S. appealed, and the Court of Appeals vacated and remanded. The Cabinet for Health and Family Services (Cabinet) petitioned this Court for discretionary review, which we granted. After our review of the record and the law, we reverse the Court of Appeals and reinstate the judgment of the Kenton Family Court.

---

[1] Due to the confidential nature of the proceedings, the mother and child will be identified by their initials.

## BACKGROUND

K.S. is the mother of A.W.S., a male child who was born on January 6, 2014. K.S. advised hospital personnel that she did not know how to properly care for the child, and the Cabinet became involved and took custody, placing the child in foster care six days later, where he remains to this day. The father has been absent from the child's life since birth and has never sought reunification with the child.[2]

K.S. resided with her mother in an apartment that was not suitable for the child due to concerns with bedbugs and roaches; the presence of her mother's brother, who had prior abuse allegations against him; and the lack of food.

K.S. has been diagnosed with a pervasive developmental disorder (autism), and her full-scale I.Q. score is 65. The Cabinet has rendered and offered services in an attempt to keep the family together. When the Cabinet determined that matters were not progressing appropriately, on June 16, 2017, well over three years after taking custody of the child, it filed a petition to involuntarily terminate the parental rights of K.S. and the child's father.

A trial was held on December 5, 2017. Dr. James Rosenthal, a licensed psychologist, testified that he had met with K.S. on two occasions, April 25, 2014, and June 6, 2014. He stated that he was initially advised by K.S. that

---

[2] The father's parental rights in A.W.S. were also terminated by the family court, and he has not appealed.

she was being treated for autism and depression. Based on K.S.'s prior medical records and his own evaluation of her at that time, he diagnosed K.S. with a pervasive developmental disorder and mild mental retardation.[3] He noted her full-scale I.Q. score of 65, which is considered borderline mental retardation, and stated that it could only deviate plus or minus five points. Dr. Rosenthal testified that he found deficits in K.S.'s social judgment, age appropriate social relationships, and cognitive skills. Additionally, he testified that intellectual disabilities usually do not improve after the age of 14 and that he did not expect any improvement by K.S. in this area even with additional treatment.

Dr. Rosenthal further testified that the child would be at risk of abuse or neglect if returned to K.S.'s care. He concluded that the stress of caring for the child would only further impair K.S.'s ability to provide appropriate care, which would increase the risk of abuse or neglect. Additionally, he testified that due to K.S.'s intellectual disabilities, she is unlikely to improve to a degree that would permit her to adequately care for the child and that there were no services that would abate the concerns if the child were returned to her care. Dr. Rosenthal did think, however, that K.S. could live independently in an apartment by herself and work part-time, which she was doing at the time of the trial.

---

[3] "Mental retardation" and "intellectual disability" have been described by the United States Supreme Court as "identical phenomenon." *Hall v. Florida*, 572 U.S. 701, 704 (2014) (Kennedy, J., concurring). The change in terminology has been approved and adopted by psychiatrists and other experts in mental disorders. *Id.*

The Cabinet's other witness was Kevin Minch, a Cabinet services office supervisor who had been employed by the Cabinet for 19 years. Minch testified that K.S. had completed most of the tasks in her case plan with the Cabinet but that he had ongoing concerns about her ability to parent the child over the long term due to her cognitive limitations. He testified that K.S. had been offered many services, but none could correct her ongoing cognitive impairments. He stated that the Cabinet's observations concerning K.S. were consistent with those of Dr. Rosenthal.

Minch further testified that even though K.S. was very likeable, worked well with the Cabinet, and loves her child, these impairments were the reason the child had not been returned to her care but had remained in foster care since birth. When asked if this was a case of "willing to be a parent" versus "ability to parent," he responded "yes." In this regard Minch also testified that he was unaware of any additional services that could be offered to allow a safe return of A.W.S. to K.S. within a reasonable period of time.

Minch noted that there was a lack of appropriate housing during this entire time and that the residence in which K.S. had lived with her mother was filthy, bug-infested, and lacked food. He acknowledged that K.S. had recently obtained an apartment close to her mother's residence but that her occupancy was unstable because she had only a month-to-month lease. Minch also testified that K.S. had supervised visitation with the child for two hours on alternate weekends at the Cabinet's office but that these visits appeared to him

4

to be more playtime as opposed to parenting. He stated he had not witnessed a parent/child bond during the visits.

Minch acknowledged that at the onset of the case, individualized services based on K.S.'s disability were not provided to her. He testified that the Cabinet became aware of the availability of such services in January 2017 when it was informed of such by Maureen Simpson-Henson, K.S.'s autism advocate. From that time such services were made available to K.S. Minch also stated that if the Cabinet had it to do over, it would have assisted K.S. in obtaining the services at that time. Although Minch was unaware of all services offered to K.S beginning in January 2017, he stated he was aware she had been referred to NorthKey but that she declined the services.

Minch also conceded that for eight or nine months between January 2016 through January 2017, the case became stagnant because of changes in Cabinet caseworkers. He stated, however, that during this entire period of time services were provided to K.S., she continued her regular visitation with A.W.S., and there was always a caseworker assigned to K.S. who was available to her. Further, he stated that K.S. never requested custody or additional services during this time.

Minch testified there were individual services that could benefit K.S. and that she was receiving services for developmental delays, including speech therapy and physical therapy. Nevertheless, Minch testified he thought the Cabinet had made reasonable efforts to reunify K.S. with her child but that the situation had not progressed to a sufficient level due to K.S.'s cognitive

5

disabilities. And, as noted above, he testified he was unaware of any additional services that could be offered to K.S. that would result in the safe return of the child to K.S. within a reasonable time.

Minch further stated that in April or May of 2017, a month or so before the Cabinet filed the petition to terminate K.S.'s parental rights, the Cabinet had recommended to the trial court that the family receive an assessment by Dr. Edward Conner.[4] This assessment never took place because, according to Minch, K.S.'s autism advocate notified the Cabinet that the release K.S. had signed in connection with the assessment should be "destroyed."

Minch testified that termination proceedings were instituted shortly thereafter because the Cabinet felt it had hit a "roadblock" when the proposed assessment fell through. He also stated that A.W.S. "had been in permanency limbo for too long at this point." At the time the petition was filed, the child had been in foster care with the same family for 41 months, and at the time of the trial, the child had been in foster care for 46 months. Concerning the foster parents, Minch stated that the child has a strong emotional attachment to them and calls them "mommy" and "dad."

In addition to the testimony of Dr. Rosenthal and Kevin Minch, the Cabinet sought to introduce an assessment from the CATS Clinic.[5] Dr.

---

[4] In a May 17; 2017 report from the Cabinet to the trial court, the Cabinet stated that "it is strongly recommended that the family receive an updated assessment through the office of Dr. Edward Conner to determine what is in the best interest of [A.W.S.]."

[5] According to its website, the Comprehensive Assessment and Training Services Program (CATS) is connected with the University of Kentucky and "provides timely, multidimensional, comprehensive assessments of families and children

6

Rosenthal had recommended a CATS assessment, and Minch testified that the assessment provides a recommendation as to long-term placement and was relied upon by the Cabinet in this case.

K.S.'s attorney, however, objected to the introduction of the report on grounds of hearsay since a CATS representative was not present to testify. The trial court sustained the objection, and the CATS assessment report was not allowed into evidence.

Maureen Simpson-Henson, K.S.'s autism advocate since January 2017, testified on K.S.'s behalf. Simpson-Henson is a speech and language pathologist who worked with K.S. by providing speech and language therapy to her when she was a young child in the school system. She stated that she was on the original team of professionals that diagnosed K.S. with autism during her childhood.

In January 2017 Simpson-Henson advised the Cabinet of additional services available to assist K.S., and she stated that K.S. had improved her parenting skills and could continue to improve them. She also testified that additional available services would "absolutely" help K.S. in her daily life. She noted that K.S. was very bright and has become much more independent since A.W.S.'s birth. She stated that K.S. has matured and learned to take care of herself much better since the birth of A.W.S. Simpson-Henson described K.S. as a "high-functioning individual with autism."

_____

identified by the Department of Community Based Services (DCBS) that meet certain criteria."

7

K.S. testified on her own behalf. She acknowledged that when A.W.S. was born, she did not know how to care for him and that she told hospital personnel that. She stated that she took parenting classes and believes she has the ability to parent the child. K.S. also testified that she loves her son and has had regular supervised visitation with him since birth. She also stated that she has complied with everything the Cabinet would have her to do. She testified that she now has a suitable apartment with two bedrooms and that she knows what to do when health emergencies arise.

On December 14, 2017, the family court entered Findings of Fact and Conclusions of Law and a Judgment Terminating Parental Rights. Therein, the court terminated the parental rights of K.S. and the child's father. The court's findings, which it noted were based on clear and convincing evidence, included that while K.S. had completed most of her tasks with the case plan, her developmental delays impeded a return of the child to her. Further, the court concluded that K.S.'s ability to change was limited due to her mental health diagnosis. The court stated that while K.S.'s current level of functioning had improved, it was not likely to change, especially considering the stress of parenting should the child be returned to her care.

More specifically, the court found that the parents had "failed to protect and preserve the child's fundamental right to a safe and nurturing home and this is a neglected child." The court noted that K.S. was able to take care of herself to a degree, but that "there was not any testimony that she would have the ability to provide care and protection for a minor child." Further, the court

8

stated that "neither parent has made sufficient progress toward identified goals" and "neither parent has been able to achieve self-sufficiency or the necessary parenting skills to care for this child, resulting in the minor child remaining in foster care for 46 months."

The court found that the parents "for a period of not less than six (6) months, have continuously or repeatedly failed or refused to provide or have been substantially incapable of providing essential parental care and protection for the child and there is no reasonable expectation of improvement in parental care and protection, considering the age of the child." *See* KRS[6] 625.090(2)(e). Specifically, the court determined that "[t]here is a significant risk of neglect if the child were returned." In addition, the court found that the child had been in foster care for a total of 46 months, which was the child's entire life. *See* KRS 625.090(2)(j).

Further, the court found that the parents "for reasons other than poverty alone, have continuously or repeatedly failed to provide or are incapable of providing essential food, clothing, shelter, medical care or education reasonably necessary and available for the child's well-being and there is no reasonable expectation of significant improvement in the parents' conduct in the immediately foreseeable future, considering the age of the child." *See* KRS 625.090(2)(g).

---

[6] Kentucky Revised Statutes.

The court further found that termination of parental rights was in the child's best interest, as the child will be able to achieve permanency and stability. The court noted that the child was in an adoptive home where his ongoing needs were being met consistently by the foster parents. *See* KRS 625.090(3)(e).

Also, the court found that K.S. "has been consistently unable to care for the immediate and ongoing physical or psychological needs of the child because of the parent's emotional illness, mental illness, or mental deficiency as defined in KRS 202A.011(9) or KRS 202B.010(9), and the condition has been diagnosed by a qualified mental health professional." *See* KRS 625.090(3)(a).

In addition, the court found that the Cabinet had attempted to render services to keep the family together, but that there were "no further available and reasonable reunification services which may be offered by the Cabinet that would be likely to bring about lasting parental adjustment enabling a return of the child to the parents." *See* KRS 625.090(3)(c). Finally, the court concluded that the child is a neglected child as that term is defined in KRS 600.020(1). Following the entry of the judgment terminating the parental rights of the parents, K.S. appealed to the Court of Appeals.

The Court of Appeals vacated the family court's judgment terminating the parental rights of K.S. and remanded the case "for additional services to the Mother to ascertain whether the Mother is capable of parenting this child while keeping in mind the child's best interest." The Court of Appeals reasoned that the evidence was insufficient to prove the child was neglected.

10

In explaining its decision, the Court of Appeals noted that Dr. Rosenthal had testified that the "risk of neglect" was high, given K.S.'s reasoning skills. The Court of Appeals stated it could not accept the Cabinet's assertion that the child was neglected when "the Mother never had the opportunity to parent the child independently because Child has always been committed to the Cabinet's custody." The Court of Appeals further held that "for a parent to neglect a child, he or she must intend to do so." Based on that holding, the Court of Appeals concluded that "the facts of this matter implicate dependency, which is different from neglect." Following the decision of the Court of Appeals vacating and remanding to the Kenton Family Court, we granted the Cabinet's motion for discretionary review.

The Court of Appeals rendered its decision on August 17, 2018. One month later, on September 27, 2018, we rendered our opinion in *Cabinet for Health and Family Services on behalf of C.R. v. C.B.*, 556 S.W.3d 568 (Ky. 2018). In that case, the trial court had found the child to be neglected due to the risk of harm associated with the parent's substance abuse issues. *Id.* at 571. In that case, as in this one, the Court of Appeals reversed the trial court and held that the child could not be found to be neglected because the parent had never exercised custodial control or supervision over the child. *Id.*

In the *C.B.* case, this Court reversed the Court of Appeals and reinstated the orders of the trial court terminating the parental rights of the parent. *Id.* at 576. Therein, we plainly held that "a parent does not have to be exercising control or supervision in order to be found to have neglected or abused a

child." *Id.* at 573. We stated that "a family court certainly does not have to wait for actual harm to occur before taking protective measures." *Id.* at 576.

## THE FAMILY COURT'S DECISION TO TERMINATE K.S.'S PARENTAL RIGHTS IS SUPPORTED BY THE RECORD

### Standard of Review

In *Cabinet for Health & Family Servs. v. K.H.*, we described the applicable appellate standard of review in a termination of parental rights case as follows:

> . . . . the trial court has wide discretion in terminating parental rights. *Cabinet for Health and Family Services v. T.N.H.*, 302 S.W.3d 658, 663 (Ky. 2010) (citing *K.R.L. v. P.A.C.*, 210 S.W.3d 183, 187 (Ky. App. 2006)). Thus, our review is limited to a clearly erroneous standard which focuses on whether the family court's order of termination was based on clear and convincing evidence. Kentucky Rules of Civil Procedure ("CR") 52.01. "Pursuant to this standard, an appellate court is obligated to give a great deal of deference to the family court's findings and should not interfere with those findings unless the record is devoid of substantial evidence to support them." *T.N H.*, 302 S.W.3d at 663. Due to the fact that "termination decisions are so factually sensitive, appellate courts are generally loathe to reverse them, regardless of the outcome." *D.G.R.*, 364 S.W.3d at 113.

423 S.W.3d 204, 211 (Ky. 2014).

"Clear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent-minded people." *M.P.S. v. Cabinet for Human Resources*, 979 S.W.2d 114, 117 (Ky. App. 1998) (citing *Rowland v. Holt*, 253 Ky. 718, 726, 70 S.W.2d 5, 9 (1934)). "The trial court has a great deal of discretion in determining whether the child fits within the abused or neglected category and whether the abuse or

neglect warrants termination." *Id.* (citing *Department for Human Resources v. Moore*, 552 S.W.2d 672, 675 (Ky. App. 1977)).

**The Family Court's Termination Judgment**

Pursuant to KRS 625.090, to involuntarily terminate parental rights, the trial court must find by clear and convincing evidence: (1) that the child is an abused or neglected child as defined by KRS 600.020(1); (2) that termination would be in the best interest of the child; and (3) that one or more of the grounds enumerated in KRS 625.090(2) exists. KRS 625.090(1) and (2). In considering the best interest of the child and the existence of a ground for termination, a court is required to consider the factors enumerated in KRS 625.090(3).

First, the family court had to determine whether the child was an abused or neglected child as that term is defined in KRS 600.020(1). In its Findings of Fact and Conclusions of Law, the family court made the following findings:

> 24. [K.S. (and the Child's Father)], for a period of not less than six (6) months, have continuously or repeatedly failed or refused to provide or have been substantially incapable of providing essential parental care and protection for the child and there is no reasonable expectation of improvement in parental care and protection, considering the age of the child. Neither parent has demonstrated an ability to provide appropriate parental care for the child. There is significant risk of neglect if the child were returned.

> 25. [K.S. (and the Child's Father)] for reasons other than poverty alone, have continuously or repeatedly failed or refused to provide or are incapable of providing essential food, clothing, shelter, medical care or education reasonably necessary and available for the child's well-being and there is no reasonable expectation of significant improvement in the parents' conduct in the immediately foreseeable future, considering the age of the child. . . .
> Respondent mother does not pay any child support. Neither

13

parent showed evidence of providing for the daily needs of the minor child, including food, clothing, shelter, medical care or education.

26. The child subject of this action has been in foster care under the responsibility of the Cabinet for Health and Family Services, for fifteen (15) of the most recent twenty-two (22) months preceding the filing of the petition to terminate parental rights. At the time of the filing, the child had been in foster care for 41 months. At the time of trial, he has remained in care for a total of 46 months, which is [his] entire life.

The testimony of Cabinet witnesses Dr. James Rosenthal and Cabinet supervisor Kevin Minch provides clear and convincing evidence to support these findings, and they will not be disturbed upon review. Dr. Rosenthal testified that in his professional opinion K.S.'s disability was such that she was unlikely to improve to a degree that would permit her to give adequate care to the child and that there were no services that would abate the concerns if the child were returned to her. Minch testified that the Cabinet's observations were consistent with Dr. Rosenthal's and that he was unaware of any additional services that could be offered to K.S. that could result in a safe return of the child to her within a reasonable period of time. Further, he noted that child had been in foster care for nearly four years at the time of the trial and that the child "has been in permanency limbo far too long at this point." In support of this opinion, Minch stated that during the lengthy period the child had been in foster care, matters had not progressed to a degree that would allow a return of custody to K.S. And, Minch noted that shortly before termination proceedings were filed, the Cabinet had recommended an assessment by Dr. Conner but that K.S. had declined to participate.

14

In light of the above testimony, we conclude that there was clear and convincing evidence to support the findings and conclusions of the trial court. These findings fit within the definitions of an "abused or neglected child" under KRS 600.020(1)(a). *See* KRS 600.020(1)(a)3 ("[e]ngages in a pattern of conduct that renders the parent incapable of caring for the immediate and ongoing needs of the child"); KRS 600.020(1)(a)4 ("[c]ontinuously or repeatedly fails or refuses to provide essential parental care and protection for the child"); KRS 600.020(1)(a)8 ("[d]oes not provide the child with adequate care, supervision, food, clothing, shelter, or medical care necessary for the child's well-being"); and KRS 600.020(1)(a)9 ("[f]ails to make sufficient progress toward identified goals as set forth in the court-approved case plan to allow for the safe return of the child to the parent that results in the child remaining committed to the cabinet for fifteen (15) of the most recent twenty-two (22) months").

After finding the child is an abused or neglected child, the trial court next must determine by clear and convincing evidence whether termination is in the best interest of the child.[7] The factors to be considered by the trial court in determining the best interest of the child are listed in KRS 625.090(3).

In support of its conclusion that termination was in the best interest of the child, the family court made the following findings:

> 27. It is in [the child's] best interests that the parental rights of [K.S.] be terminated. The minor child will be able to achieve

---

[7] Because the Court of Appeals determined that the child was not an abused or neglected child, it did not proceed beyond the first step of the process and so did not address the best interest of the child or whether one of the grounds enumerated in KRS 625.090(2) exists.

15

permanency and stability. He is in an adoptive home, where his ongoing needs are being consistently met by the foster parents.

28. [K.S.] has been consistently unable to care for the immediate and ongoing physical or psychological needs of the child because of the parent's emotional illness, mental illness, or mental deficiency as defined in KRS 202A.011(9) or KRS 202B.010(9), and the condition has been diagnosed by a qualified mental health professional.

It is apparent that the family court considered the factors enumerated in KRS 625.090(3). In fact, the court made specific reference to the factors in KRS 625.090(3)(a), (c), and (d). Again, the testimony of Dr. Rosenthal and Kevin Minch and K.S.'s underlying mental health and Cabinet records provide clear and convincing evidence in support of the court's findings. We will not disturb these findings in our review.

Lastly, no termination of parental rights is permitted unless the trial court finds by clear and convincing evidence that one of the grounds listed in KRS 625.090(2) exists. The relevant grounds contained in KRS 625.090(2) are:

(2) No termination of parental rights shall be ordered unless the Circuit Court also finds by clear and convincing evidence the existence of one (1) or more of the following grounds:

. . . .

(e) That the parent, for a period of not less than six (6) months, has continuously or repeatedly failed or refused to provide or has been substantially incapable of providing essential parental care and protection for the child and that there is no reasonable expectation of improvement in parental care and protection, considering the age of the child;

. . . .

(g) That the parent, for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably

16

necessary and available for the child's well-being and that there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child;

. . . .

(j) That the child has been in foster care under the responsibility of the cabinet for fifteen (15) cumulative months out of forty-eight (48) months preceding the filing of the petition to terminate parental rights.

As reflected in the family court's findings of fact, the court determined the grounds listed in KRS 625.090(2)(e), (g), and (j) were present. The existence of only one of the grounds in the statute needs to be proven by clear and convincing evidence. *Com., Cabinet for Health and Family Services v. T.N.H.,* 302 S.W.3d 658, 663 (Ky. 2010). Again, the testimony of the Cabinet's witnesses and the underlying Cabinet and medical records provide clear and convincing evidence to support the court's findings, and such findings will not be disturbed on appeal.

**Intent Requirement**

In its decision vacating the family court's order, the Court of Appeals asserted that there was an intent requirement associated with KRS 600.020. More specifically, the Court of Appeals' decision states as follows:

> A review of [KRS 600.020] shows that *for a parent to neglect a child, he or she must intend to do so.* We do not believe it has been established that Mother *intended* to neglect the child. Instead, the facts of this matter implicate dependency, which is different than neglect. While dependency may occur in circumstances similar to neglect, it lacks the requisite intent on the part of the parent. "A child who suffers harm as a result of a parent's intentional acts is neglected or abused. In contrast, a child is dependent if the harm results from a parent's unintentional acts, or from a cause

17

unrelated to parental culpability." L. GRAHAM & J. KELLER 15 KY. PRACTICE SERIES, DOMESTIC RELATIONS LAW § 6:9 (2017). (emphasis added). We disagree with the Court of Appeals' conclusion that KRS 600.020 in all cases requires that a parent *intend* to abuse or neglect his or her child for a finding of abuse or neglect to be reached by a trial court.

A similar argument was made by the parent whose parental rights were terminated in *A.L. v. Cabinet for Health and Family Services*, No. 2015-CA-000844-ME, 2016 WL 447679 (Ky. App. Feb. 5, 2016). In *A.L.* the mother argued, as in this case, that her intellectual disability alone was insufficient to warrant a finding that her child was neglected and that some willful failure to comply with the Cabinet's case plan or some intent to abuse or neglect is required for a finding that a child is abused or neglected. *Id.* at *4.

In rejecting the parent's argument in the *A.L.* decision that some intent to abuse or neglect is required, the Court of Appeals stated as follows:

> Nonetheless, we must interpret the language of KRS 600.020(1)(a)(9) as written. *See Commonwealth v. Plowman*, 86 S.W.3d 47, 49 (Ky.2002) (stating "[s]tatutes must be given a literal interpretation unless they are ambiguous and if the words are not ambiguous, no statutory construction is required[.]"). The language of KRS 600.020(1)(a)(9) does not include an element of intent. If the legislature had intended to include an element of intent in this subsection, it would have done so. This conclusion is further evidenced by the fact that numerous other situations listed in KRS 600.020(1)(a) as constituting abuse or neglect of a child include an element of willfulness or intent. *See*, e.g., KRS 600.020(1)(a)(1), (5), (7). Thus, willful or intentional failure to make progress towards identified case plan goals is not necessary to a finding that a child is neglected pursuant to KRS 600.020(1)(a)(9); any failure to make such progress is sufficient.

*A.L.*, at *5.

18

We are persuaded that this discussion in *A.L.* concerning an intent requirement in relation to KRS 600.020 is a correct application of the rules of statutory interpretation, and we adopt its analysis as an accurate framework for ascertaining any intent requirement concerning KRS 600.020. As noted in that analysis, some provisions contain an intent requirement, and some do not.

In its application of KRS 600.020, the family court in this case made findings reflecting that KRS 600.020(1)(a)3, KRS 600.020(1)(a)4, KRS 600.020(1)(a)8, and KRS 600.020(1)(a)9 applied under the facts of this case. As determined in *A.L.*, KRS 600.020(1)(a)9 does not contain an intent requirement. An examination of the text of KRS 600.020(1)(a)3, KRS 600.020(1)(a)4, and KRS 600.020(1)(a)8 discloses that these provisions likewise do not contain an intent requirement.

We conclude that the Court of Appeals erred by applying an intent requirement to the statutory provisions invoked by the family court in this case to terminate K.S.'s rights.

**Risk of Future Harm versus Current Harm**

In its decision reversing the family court's termination judgment, the Court of Appeals stated:

> The evidence on the record is primarily from Dr. Rosenthal stating that Mother's limited intellect and adaptive behavior skills give rise to a risk of neglect. We believe that "risk of neglect" is not the same as neglect but rather indicates a child is dependent. Hence, we do not believe sufficient evidence was provided to show Child was a neglected child.

As noted above, KRS 600.020(1) states: (1) "Abused or neglected child" means a child whose health or welfare is harmed *or threatened with harm* when: [nine situations defining neglect listed]." (emphasis added).

It follows from this definition that where a child whose health or welfare is *threatened* with harm, that is, whose health or welfare has not actually been harmed but where there is a clear and convincing *threat* of harm to a child, a trial court is authorized under this definition to find that the child is an abused or neglected child. We resolved this issue in *Cabinet for Health and Family Services on behalf of C.R. v. C.B.*, cited earlier herein, where we stated as follows:

> As stated in KRS 600.020(1)(a)(2), a court can find neglect if an individual "creates or allows to be created a risk of physical or emotional injury as defined in this section to the child by other than accidental means." "The statute, as written, permits the court's finding where a *risk of abuse* exists and *does not require actual abuse* prior to the child's removal from the home or limitation on the contact with an abusive parent." *Z.T. v. M.T.*, 258 S.W.3d 31, 36 (Ky. App. 2008) (emphasis added).

556 S.W.3d 568, 576 (Ky. 2018).

Similarly, we held in *Com., Cabinet for Health and Family Services v. T.N.H.*, 302 S.W.3d 658 (Ky. 2010), in response to a parent's argument that there was no evidence of abuse or neglect because the child had been committed to the Cabinet the whole time and his needs were being met by relatives or foster parents, that the child could still be considered neglected due to failure to complete case plan goals. *Id.* at 662.

20

We have long held that "a statute must not be interpreted so as to bring about an absurd or unreasonable result and that in the process of interpretation, courts should look behind the strict wording of the statute to ascertain its purpose and the mischief it was designed to remedy." *Stidham v. Henson*, 887 S.W.2d 353, 354 (Ky. 1994) (citing *George v. Alcoholic Beverage Control Board*, 421 S.W.2d 569 (Ky. 1967)). It would produce an unreasonable result to interpret our termination statutes not to permit the commencement of termination proceedings when the facts demonstrate that the return of the child to a parent would result in a threat to the health and welfare of the child, when that situation is unlikely to ever improve.

Termination is often, as is apparently the case here, the first step in the adoption process. It would produce an unreasonable result to condemn a child to permanent foster care status because he cannot be returned to his parent because of an actual threat to his health or welfare, but at the same time hold that that actual threat is insufficient to adjudicate the child as neglected.

We conclude the Court of Appeals erred to the extent it held there must be actual past or present abuse or neglect for a trial court to make a finding of abuse or neglect; rather, clear and convincing proof of a potential threat of abuse or neglect if the child is returned to the parent is sufficient to support such a finding. Here, testimony from the Cabinet's witnesses supports the family court's finding of such a threat considering K.S.'s borderline IQ, cognitive deficiencies, and demonstrable lack of child care skills.

21

**Transitioning from Dependent Child to Neglected Child**

In its analysis the Court of Appeals included the notion that because A.W.S. had previously been found to be dependent, that placed an obstacle in the way of the present abuse and neglect proceeding so as to obstruct his transitioning from a dependent child to an abused or neglected child thereby supporting termination. KRS 600.020(20) provides the definition of a dependent child:

> "Dependent child" means any child, other than an abused or neglected child, who is under improper care, custody, control, or guardianship that is not due to an intentional act of the parent, guardian, or person exercising custodial control or supervision of the child[.]"

Noting the distinction between a dependent child and an abused or neglected child, the Court of Appeals stated in this case that "[o]ur courts have long held that a child cannot be both neglected and dependent. *J.H. v. Commonwealth, Cabinet for Human Resources*, 767 S.W.2d 330, 332 (Ky. App. 1988)." Court of Appeals Slip Op. at 9. The Court of Appeals stated that "the facts of this matter implicate dependency, which is different than neglect."

The *J.H.* case, which was decided over 30 years ago, did hold that a child could not be both dependent and neglected or abused under KRS 600.020. 767 S.W.2d at 332-33. In *Z.T. v. M.T.*, 258 S.W.3d 31 (Ky. 2008), however, we noted that *J.H.* was decided under a prior version of KRS 600.020 and that the statute now "permits a finding that a parent or guardian is abusive or negligent who creates or allows to be created, a risk of abuse or neglect." *Id.* at 36.

22

This proceeding demonstrates how a child may initially be taken into the Cabinet's custody as a dependent child because of improper care that is not due to an intentional act of the parent. Here, upon birth of the child, the mother was manifestly ill-prepared to undertake adequate care for A.W.S. The proper first step was for a dependency action whereby the Cabinet could assume responsibility for that care until, hopefully, A.W.S. would be able to be reunited with his mother.

As reflected by the family court's findings, however, a transitioning of the child from a dependent child to a neglected child occurred because of developments which demonstrated that, after four years, returning A.W.S. to his mother would create a substantial threat to his health or welfare and that the situation was unlikely to change. According to testimony by Dr. Rosenthal, A.W.S. could not now or in the future be returned to K.S. without endangering his health and welfare. Thus, the child was properly transitioned by the family court from a dependent child to a neglected child.

In this same vein, the Court of Appeals appeared to conclude that K.S. had simply not been given enough time to improve her child care abilities or given the opportunity to prove she had acquired those abilities, and so the transitioning of the child from a dependent child to a neglected child was premature. The family court, however, determined otherwise. And, as explained above, we believe the testimony of the Cabinet's witnesses provided clear and convincing evidence to support the finding.

23

**Intellectual Disability as a Factor in Termination**

Justice Lambert's dissent raises a number of issues that merit our addressing. Many of these issues involve the services provided by the Cabinet to K.S. as well as the sufficiency of the evidence to support the termination judgment. The dissent also raises concerns involving the applicability of the Americans with Disabilities Act (ADA).

First, the dissent states that the Cabinet has yet to provide the statutorily required reasonable efforts and appropriate services to reunite K.S. and her child. We believe the evidence supports the trial court's finding that such efforts were undertaken. The Cabinet representative testified that K.S. was provided services for the duration of the case, including the January 2016 to January 2017 period when the case was stagnating. Further, more individualized services were offered beginning in January 2017, and there was testimony that while some of the services may have been accepted, at least the NorthKey referral had been declined by K.S. The proposed assessment by Dr. Conner had also been declined by K.S. through her advocate, although we have found nothing in the record to indicate why.[8]

The dissent indicates that more appropriate services should have been offered to K.S. in connection with her intellectual disability. This situation is similar to that in *In re Terry*, 240 Mich. App. 14, 610 N.W.2d 563 (Mich.Ct.App.

---

[8] Although there was testimony that the NorthKey referral and the Dr. Conner assessment were declined, we again note that generally K.S. did everything the Cabinet asked of her.

24

2000). In that case the mother whose parental rights were terminated likewise had been diagnosed as developmentally disabled. *Id.* at 566. As in this case, the mother in *Terry* loved her children, had bonded with them, and had good intentions. *Id.* at 567. As in this case, the trial court in *Terry* determined that while the mother loved the children, she did not have the ability to care for them. *Id.* Ultimately, the appellate court concluded that the trial court's finding that further extensive delay to enable the mother to continue to improve on basic parenting skills was not in the best interests of the children was not clearly erroneous. *Id.* at 569.

In *Terry* the mother contended, as does the dissent herein, that she was not offered appropriate services in light of her disability, which constituted a violation of the ADA. *Id.* The appellate court in *Terry* held that "[a]ny claim that the state agency was violating the ADA "must be raised in a timely manner, however, so that reasonable accommodations can be made." *Id.* at 570. The court further held that if the parent believed the agency was "unreasonably refusing to accommodate a disability, the parent should claim a violation of her rights under the ADA, either when a service plan is adopted or soon afterward." *Id.* Because the mother in that case did not raise a challenge to the nature of the services until the closing argument at the termination hearing, the appellate court held that it was "too late in the proceedings to raise the issue." *Id.* at 570-71.

In this case there is no indication that prior to the termination hearing K.S. (or her attorney) raised the issue that she had not been provided

25

appropriate services as they relate to her disability. We conclude that because K.S. did not raise a challenge to the services that were being provided to her at the time, the issue has been waived for our review.

Next, the dissent contends that the risk of harm in this case is built entirely on the assumption that a person with mild cognitive deficits cannot parent. The dissent states that terminating an individual's parental rights based primarily on an intellectual disability violates the Americans with Disabilities Act (ADA) and that one of the most determinative factors in this case was the single IQ test administered by Dr. Rosenthal, which the dissent states is an insufficient analysis for persons such as K.S. and is also insufficient evidence upon which to terminate her rights.

We disagree that the evidence indicates K.S.'s parental rights were terminated based primarily on her IQ test. In addition to the IQ test, there was considerable testimony from both Dr. Rosenthal and Kevin Minch concerning the long-term inability of K.S. to provide adequate parental care of the child and the lack of a likelihood of improvement with a reasonable time. While such evidence obviously consisted of evidence as to K.S.'s intellectual disability as it relates to her ability to parent, it also included the interactions and observations of K.S. by the Cabinet over a period of nearly four years.

The dissent states that K.S. asked for help with caring for her child after birth and that the Cabinet took temporary custody before she was even able to leave the hospital. The implication is that the Cabinet took the child against K.S.'s wishes immediately after birth. The record indicates, however, that it

26

was apparent to those caring for K.S. as well as to K.S. herself that she did not have the ability at that time to care for the child. K.S. told hospital personnel that she was unsure of how to provide child care and did not know how to feed or change the child. A report was made that K.S. did not appear to be grasping the concept of caring for a baby. And, there were unsatisfactory living arrangements available at the time. We see no indication that the Cabinet inserted itself inappropriately into the situation; rather, it was made aware that K.S. was unable to care for the child immediately after birth.

The dissent cites KRS 202B.010(9) for the argument that in order to be considered an "individual with an intellectual disability" for purposes of involuntary termination of parental rights, there must be proof that K.S. had "subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior[.]" KRS 202B.010(9). The dissent maintains in this regard that Dr. Rosenthal did not conduct an appropriate examination of K.S.'s adaptive functioning. Dr. Rosenthal indicated in his testimony that he evaluated K.S. and determined intellectual deficits and cognitive deficits as well as adaptive and reasoning deficits. He stated that in order to get a more comprehensive evaluation, he recommended a CATS assessment.[9]

---

[9] While the CATS assessment report was not allowed into evidence by the trial court due to it being inadmissible as hearsay, the May 17, 2017 Cabinet report stated that the CATS assessment occurred in early-2015 and indicated that reunification could not be supported. That assessment report was not subject to consideration by the trial court and is not subject to our consideration.

27

Despite the CATS assessment report not being allowed into evidence at the trial, deficits in K.S.'s adaptive abilities are, however, reflected in the record in several ways. For example, K.S. failed to adapt to her impending status as a mother by not acquiring the necessary skills to care for the child during her pregnancy; failed to adapt to her duty to consistently maintain a residence suitable for the health and well-being of a child; exhibited limitations in her cognitive abilities that may similarly serve as a measure of her lack of adaptive skills; and failed, after four years, to develop the parenting skills necessary to independently care for A.W.S.

Lastly, many of the issues raised by the dissent are not matters that were raised either in the trial court, the Court of Appeals, or the briefs filed by the parties with this Court. These include whether Dr. Rosenthal's examination was sufficiently complete or whether he erroneously failed to conduct further tests that were required; whether the ADA was violated[10]; whether the trial court erroneously relied primarily upon the IQ test; and whether the trial court relied on any parenting evaluations, and if not, whether the failure to do so was reversible error.

That being said, we generally agree with the concerns raised by Justice Keller in her opinion concurring in result only as to the manner in which this

---

[10] Although we are unaware of the issue having been previously decided by Kentucky courts, the Supreme Court of Hawai'i has held that ADA violations are not a defense to a termination proceeding. *In re Doe*, 100 Hawai'i 335, 341, 60 P.3d 285, 291 (2002). Further, in *In re Terry*, discussed earlier herein, it was held that "a parent may not raise violation of the ADA as a defense to termination proceedings." 240 Mich.App. at 25, 610 N.W.2d at 570.

case was handled. And we agree with the concerns raised by Justice Lambert in her dissenting opinion concerning generally the termination of parental rights in cases where a parent has an intellectual disability, such as was the case with K.S.

Here, the Cabinet openly acknowledged that it was not aware at the onset of the case that there were individualized services for persons with intellectual disabilities that could have been made available to K.S. but were not until much later. Other concerns arose thereafter, as has been noted herein and in the separate opinions. And, as Justice Lambert notes, there is a danger in cases such as this that the rights of an intellectually disabled person could be terminated due to a bias or improper conclusion that the disability creates a presumption that the parent is unable to provide adequate care for the child.

**CONCLUSION**

KRS 620.010 provides that

> . . . . this chapter shall be interpreted to effectuate the following express legislative purposes regarding the treatment of dependent, neglected and abused children. Children have certain fundamental rights which must be protected and preserved, including but not limited to, the rights to adequate food, clothing and shelter; the right to be free from physical, sexual or emotional injury or exploitation; the right to develop physically, mentally, and emotionally to their potential; and the right to educational instruction and the right to a secure, stable family. It is further recognized that upon some occasions, in order to protect and preserve the rights and needs of children, it is necessary to remove a child from his or her parents.

29

The family court did not abuse its broad discretion in determining that the best interest of the child compelled that K.S.'s parental rights be terminated. Having examined the record and considered the applicable law, we conclude that the family court's decision was supported by clear and convincing evidence.

For the foregoing reasons, the Court of Appeals Opinion Vacating and Remanding is reversed, and the judgment of the Kenton Family Court is reinstated.

All sitting. Minton, C.J., Hughes and VanMeter, JJ., concur. Keller, J., concurs in result only by separate opinion in which Minton, C.J., joins. Lambert, J., dissents by separate opinion in which Wright, J., joins. Wright, J., dissents by separate opinion in which Lambert, J., joins.

KELLER, J., CONCURRING IN RESULT ONLY: I write separately to express my view that the system, as a whole, failed K.S., a mother who asked for help when her son was born. K.S.'s son, A.W.S, was born on January 6, 2014. While still in the hospital with A.W.S., K.S. asked for help caring for her son, as she recognized that she did not know how to properly care for an infant. Before he even left the hospital, A.W.S. was taken into the custody of the Cabinet for Health and Family Services (hereinafter, "Cabinet"). From January 13, 2014, the date emergency custody was granted to the Cabinet, until the present day, K.S. has attempted to work with the Cabinet to learn how to properly care for her son. To this day, I question whether K.S. ever received the help that she requested within just days of her son's birth.

30

According to Cabinet reports included in the record, K.S. engaged in parenting classes with Catholic Charities beginning in March 2014. She successfully completed these classes in August 2014. According to testimony from Kevin Minch, a supervisor with the Cabinet, K.S. completed almost every task on her case plan. Despite this, on December 14, 2015 reasonable efforts[11] to reunify A.W.S. with K.S. were waived, and the permanency plan for A.W.S. was changed from reunification to adoption. Despite her efforts, and through no fault of her own, K.S.'s case with the Cabinet was stagnant for close to a year, from January 2016 to January 2017, allegedly due to changes in Cabinet caseworkers. It goes without saying the significance of an entire year in a toddler's life. Further, according to Minch, K.S. was not provided with any services specific to her disability to assist her in learning how to better parent her son. It was not until January 2017, when Maureen Simpson-Henson, an "autism advocate," became involved in K.S.'s case, that referrals were made to services that could assist someone with her specific disabilities. The initial failure by the Cabinet to provide targeted services to address K.S.'s issues is also deeply troubling.

---

[11] "Reasonable efforts" are defined in KRS 620.020(13) as "the exercise of ordinary diligence and care by the department to utilize all preventive and reunification services available to the community in accordance with the state plan for Public Law 96-272 which are necessary to enable the child to safely live at home." Public Law 96-272 requires that all states have a plan which includes that "reasonable efforts will be made...to make it possible for the child to return to his home" in order to receive federal payments for foster care and adoption assistance. Under certain circumstances, found in KRS 610.127, reasonable efforts can be waived.

31

While K.S. was working with the Cabinet, she was only allowed very limited visitation with A.W.S. While the amount of visitation fluctuated as the case progressed, she never had visitation for more than four hours at a time or more than one time each week. Her visits with A.W.S. were always supervised and often held in the Cabinet office. This limited visitation was not sufficient for her to develop or demonstrate her parenting skills. Further, K.S. testified that she had never been offered any classes to teach her how to parent an older child, despite her son being almost four years old when the termination of parental rights (hereinafter, "TPR") hearing took place. Finally, Minch and Simpson-Henson both testified at the TPR hearing that additional services existed that could help K.S. increase her parenting skills, but Minch did not believe these could be completed in a "reasonable amount of time." After reviewing the entire record, I question whether K.S. ever received the help in parenting her son that she requested when he was just a few days old.

K.S. has unique intellectual and cognitive issues. Maureen Simpson-Henson testified that she was part of an initial diagnostic team from Cincinnati Public Schools that evaluated K.S. when she was a child. Simpson-Henson testified that K.S. had language needs, was developmentally delayed, and had autism. However, Simpson-Henson also testified that K.S. was "bright" and "high-functioning." Dr. James Rosenthal, a licensed psychologist, on the other hand, testified that while K.S.'s NorthKey[12] treatment notes indicated

---

[12] NorthKey Community Care provides mental health, substance use and developmental disabilities services in Northern Kentucky.

diagnoses of pervasive developmental disorder and autism, he did not see indications of either of these diagnoses. He saw intellectual deficits, as well as "deficits in social judgment, age appropriate social relationships, abstract reasoning, and cognitive skills."

Dr. Rosenthal further testified that K.S. completed regular education classes until she dropped out of high school in the tenth grade. He noted that the intellectual functioning he observed was "pretty consistent" with what he would expect from someone with a tenth-grade education. Despite these perceived deficits, K.S. was able to live independently in a two-bedroom apartment and maintain a part-time job at a hotel. She testified that she was working toward obtaining her GED. Specifically, she stated that she had passed the science, social studies, and reading parts of the test, and only had the math portion left. She testified that she made her own doctors appointments and could cook and clean. In fact, she testified that she loved cooking. She also testified that she babysat other people's children and knows how to take care of children, and that testimony was unrefuted.

Because of her complex confluence of issues, K.S. is a vulnerable member of our society. While she is able to do all of the things noted above, she was not able to advocate for herself throughout these proceedings. At the TPR hearing, she testified that she was bonded with A.W.S., that she loved him, and that she was still seeking to have her son returned to her. She said she would "definitely do everything [she] can" to gain custody of her son. Yet, she was never provided with an adequate chance to do this. In sum, K.S. may

have the ability to properly parent her son if she is given the proper assistance, support, and services, but she has never been provided with these things.

The most concerning issue in this case is the lack of an adaptive parenting assessment. The Cabinet recommended that K.S. undergo an adaptive parenting assessment with Dr. Edward Connor. According to the Cabinet's report dated May 11, 2017 that recommended this assessment, an adaptive parenting assessment "would combine clinical interviews and observations of [K.S.], [A.W.S.], and the current foster parents as well as review the previously completed assessments to gauge best interests and/or offer additional recommendations for services to support the family." However, **no such assessment was ever performed**. As the dissent notes, a termination of parental rights is the civil equivalent of the death penalty. With such a fundamental right hanging in the balance, it is baffling to this writer that an adaptive parenting assessment was not conducted.

The record is sparse as to any justification for why this adaptive parenting assessment was not completed. As previously stated, the Cabinet submitted to the family court a report dated May 11, 2017 that recommended an adaptive parenting assessment be completed. The family court drew a line through this recommendation and initialed it, signifying a deletion of this recommendation. A recording of the hearing in the underlying DNA[13] case, at which this recommendation was deleted, was not included in the record of the

---

[13] Dependency, Abuse, and Neglect

34

appeal of the TPR proceeding. Without this, this writer simply cannot understand why the very tool that would give the best information was deemed unnecessary by the family court and was not insisted upon by the Cabinet.

Kevin Minch testified at the TPR hearing that K.S. had agreed to undergo the adaptive parenting assessment and had signed a release to this end, but that before the referral to Dr. Connor could be made, Simpson-Henson contacted the Cabinet and asked them to destroy the release. Therefore, the referral was never made. There is no evidence in the record to indicate why Simpson-Henson requested the release be destroyed. However, even if K.S. personally did not want to participate in the assessment, which seems unlikely to this writer, the Cabinet had the ability to include the assessment on K.S.'s case plan. Further, the family court unquestionably had the authority to order the assessment be completed. Yet neither the Cabinet nor the family court insisted on having this vital piece of information. Without ascertaining K.S.'s exact deficits and abilities relating to parenting skills, the family court made a decision to impose the civil death penalty—termination of her parental rights. Again, we are left to wonder why this tool was deemed irrelevant to the family court.

My next concern lies with the CATS assessment. Dr. Rosenthal's report to the Cabinet stated that he had no information about K.S.'s relationship with her child and therefore recommended a CATS assessment. In his testimony, he stated that the CATS assessment would "look more fully at her functional skills in terms of taking care of a child." Kevin Minch described the CATS

35

assessment as "a broad-spectrum assessment" through the University of Kentucky. He stated that as part of this assessment, medical records, psychological records and psychiatric records would be reviewed. In-person interviews would be conducted and the interactions between the child and parent would be observed in order for recommendations to be made regarding "the long term best interests placement of the child[]."

A CATS assessment was completed on K.S., however, because the Cabinet did not call a witness who could properly testify to the conclusions reached as a result of the assessment, all references to them were stricken from the record. This assessment is yet another relevant and important piece of information that was not available to the family court in making its determination to terminate K.S.'s parental rights.

Without the appropriate services and without crucial assessments, I question how the family court could possibly assess the risk of neglect in this case. Frankly, the picture was incomplete.

Finally, I write separately to note that the family court's order terminating K.S.'s parental rights contained deficient findings of fact and conclusions of law. Specifically, we are left to guess under which subsections of the statute the trial court found A.W.S. to be an abused or neglected child. It is deficient trial court practice to leave an appellate court to guess about the trial court's findings and conclusions in a case of this magnitude. Nevertheless, we were able to determine that the family court's conclusions were *not clearly erroneous* – the applicable standard of review. However, this

36

required close scrutiny of the order, a detailed comparison to the language of the applicable statutes, and a full review of the record.

Kentucky's statutory provision regarding termination of parental rights is found in KRS 625.090, which requires that the family court find by clear and convincing evidence that a three-prong test has been satisfied. First, the family court must find that the child at issue is an abused or neglected child as defined in KRS 600.020(1). KRS 625.090(1)(a). Next, the family court must find that termination of parental rights is in the best interest of the child. KRS 625.090(1)(c). Finally, the family court must find that one of the enumerated statutory grounds for termination exists. KRS 625.090(2). In this case, the family court conflated the first and third prongs, making findings that perfectly track the language found in KRS 625.090(2) but not KRS 600.020(1).

One example of the above described deficiency relates to the family court's finding that K.S. has "continuously or repeatedly failed or refused to provide *or has been substantially incapable of providing* essential parental care and protection for the child." (Emphasis added.) One definition of an abused or neglected child is one whose parent "continuously or repeatedly fails or refuses to provide essential parental care and protection of the child." KRS 600.020(1)(a)(4). One enumerated statutory ground for termination is "that the parent, for a period of not less than 6 months, has continuously or repeatedly failed or refused to provide *or has been substantially incapable of providing* essential parental care and protection for the child and that there is no reasonable expectation of improvement." KRS 625.090(2)(e) (emphasis added).

37

As can be clearly seen, the family court's finding follows the language in the enumerated statutory factor but not the language in the definition of "abused or neglected child." A close review is therefore required by this Court, because if the only finding that was not clearly erroneous was that K.S. has been "substantially incapable of providing essential parental care and protection," then the family court's finding that A.W.S. was a neglected child under this subsection would have been clearly erroneous, as the "substantially incapable" language is found *only* in the enumerated statutory grounds for termination, *not* in the definition of an abused or neglected child.

Despite the order's deficiencies, we were still able to determine that the family court's findings were not clearly erroneous, as there was sufficient evidence to support a finding that K.S. "continuously or repeatedly fail[ed] or refuse[d] to provide essential parental care and protection for the child, considering the age of the child," and "[did] not provide the child with adequate care, supervision, food, clothing, shelter, and education or medical care necessary for the child's well-being" under KRS 600.020(1)(a)(4) and (8).

In concluding this separate opinion, I want to again emphasize the devastating effect this case has had, and will continue to have, on the parties involved. A.W.S. has been in the same foster home for over five and a half years now, and it is the only home he knows. We are too far down the road to "fix" this case. While there are no words to express the devastating effect this termination has on K.S., a reversal of the termination may disrupt the child's stable home which would also devastate the child and the foster parents.

38

These are extremely difficult cases, and this case was made even more gut-wrenching by K.S.'s love for A.W.S. and her sincere efforts to regain custody of him. She may have been able to overcome her deficits with the appropriate support, services, and assistance. The failures by the Cabinet and the family court in this case are simply unacceptable. Thus, it is only with the greatest hesitation that I join the majority in their result and reverse the Court of Appeals and reinstate the trial court's order.

Minton, C.J., joins.

LAMBERT, J., DISSENTING: Because the Cabinet has yet to provide the statutorily required reasonable efforts and appropriates services to reunite K.S. with her child; and because the risk of harm finding was based on the IQ test administered four years earlier, I must dissent. I would affirm the Court of Appeals' order vacating the Kenton Family Court's decision to terminate K.S.'s parental rights.

Having reviewed the entire record, it is evident that the only "sin" assignable to K.S. is the results of an IQ test given by Dr. Rosenthal in 2014, four months after her child was born. According to his testimony, the IQ test, which was one of the most determinative factors for this case, took only one hour to administer. In the present case, any "risk of harm" was built entirely on the assumption that a person with mild cognitive deficits cannot parent. K.S. was never given the opportunity to parent nor was any testing done to measure her adaptive skills. During Dr. Rosenthal's nearly thirty minutes of

39

trial testimony he only briefly discusses hypothetical situations, which he felt could lead to potential neglect of the child.

K.S. asked for help with her newborn at the hospital after he was born. Before she and her child were even able to leave the hospital, temporary custody of A.W.S. was placed with the Cabinet. K.S. promptly and successfully completed parenting classes, attended every court hearing, went to many of the child's medical appointments, worked her case plan well, visited with her son as often as permitted, sometimes weekly, worked on her GED[14], got a job as a maid at a hotel and found herself an apartment. She was persistent in her pursuit to regain custody of her child, even with the barriers of poverty and a series of social workers who, for a year, let the case fall completely off their radar. While Dr. Rosenthal emphatically gave this young mother no room to improve based on her IQ test, she managed to complete her case plan, find a job and an apartment and appeal her case. To borrow a quote from Barbara Kingsolver, "Sometimes the strength of motherhood is greater than natural laws."

According to Dr. Rosenthal's testimony, he did not observe any signs of autism spectrum behavior, only that K.S. has an IQ of 65. This score would

---

[14] K.S., though diagnosed with Pervasive Developmental Delay (a mild form of autism), completed regular high school classes until 10th grade when she withdrew, allegedly in response to being bullied.

place her in the category of mild intellectual disability.[15]  The DSM-5[16] is the standard as to what defines intellectual disabilities, and to determine that an individual has an intellectual disability the DSM requires satisfaction of three criteria:

> 1) Deficits in intellectual functioning;
>
> 2) Deficits in **adaptive functioning**[17]; and
>
> 3) The onset of these deficits during childhood.

During his trial testimony, Dr. Rosenthal said he met with K.S. on two occasions, however he never observed K.S. with her son.  The first meeting lasted approximately ninety (90) minutes and mainly consisted of family history, medical background, and filling out required forms.  In their second, and final meeting, Dr. Rosenthal administered the Wechsler I.Q. Test[18] and found her full-scale score to be a 65.  It is generally accepted that a comprehensive full-scale Wechsler IQ test would take anywhere between one to one and a half hours to complete.  Dr. Rosenthal testifies that this final meeting lasted sixty (60) minutes and was used to administer the IQ test.  Dr. Rosenthal makes no additional comments regarding further testing to determine K.S.'s adaptive functioning, and only briefly mentions adaptive

---

[15] Charlotte Jayne Cooper, *Too Stupid: Intellectual Disability as a Statutory Ground for Termination of Parental Rights,* 11 Mod. Am. 102 (2018).

[16] Diagnostic and Statistical Manual of Mental Disorders, 5th Edition.

[17] Emphasis added.

[18] The Wechsler IQ test has been used by many countries around the world for over 50 years and is widely considered the "go to" IQ test.

reasoning as a deficit as he goes through his nearly thirty minutes of testimony. Pursuant to Ky. Rev. Stat. § 202B.010(9), to be considered an "individual with an intellectual disability" for the purposes of involuntary termination of parental rights, Dr. Rosenthal (or another witness) would have needed to present proof that K.S. had "subaverage general intellectual functioning existing concurrently **with deficits in adaptive behavior**.[19]" The lack of an appropriate examination of K.S.'s adaptive functioning raises concerns about the sufficiency of the Cabinets' proof testimony as there were no tests administered to measure her adaptive skills.

> Analysis of termination of parental rights involving parents with intellectual disabilities reveals the great extent to which bias can inform these decisions. Indeed, "an inherent problem in this group [of cases] is that the termination is not simply based on the parent's past actions but on predictions about their future ones as well." In other words, judges across jurisdictions have based termination of parental rights on the speculation that neglect may occur in the future, particularly as the child ages. Another issue raised relates to supports available to the parent and family. Strikingly, some courts have found the availability or efficacy of these supports irrelevant in light of timelines set forth in the Adoption and Safe Families Act (ASFA) while others have expressed concern regarding reliance on services. Moreover, courts may rely on the testimony of inappropriate court-appointed, and at times inconsistent, experts who harbor their own prejudices. Finally, and perhaps most perplexing and prejudicial, courts have terminated parental rights because the parent's

---

[19] Emphasis added.

disability persisted (i.e., the parent was not able to become un-disabled). Thus, although "[a] parent's right to parent should rarely, if ever, be terminated based upon conjectures and speculation[,]" *the reality for many parents with intellectual disabilities is that they will have their rights terminated based largely on bias and speculation.*[20]

The use of IQ tests as the sole measure to determine a person's level of intellectual functioning has a contentious history in this country, our school systems, and our court systems. In *Larry P. v. Riles*,[21] the State Superintendent for the California school system appealed a decision holding that IQ tests administered by the school systems violated federal statutes and the Equal Protection Clause of the United States Constitution. The United States Court of Appeals, Ninth Circuit, affirmed that IQ tests used by the California School System placed a disproportionate number of African-American children in educable mentally retarded (EMR) classes. In a 1987 article published by the Journal of School Psychology, *Larry P.* was addressed as a turning point in school psychologist testing of students, stating:

> While intelligence measures have long been used in making educational placement decisions, *adaptive behavior measures, which assesses an individual's performance of daily activities* required for personal and social sufficiency, have only recently gained increased acceptance. A number of factors appear to have contributed to this growing acceptance, including recent court cases and legislation addressing the

---

[20] Robyn M. Powell, MA, JD, *Safeguarding the Rights of Parents with Intellectual Disabilities in Child Welfare Cases: The Convergence of Social Science and Law*, 20 CUNY L. Rev. 127, 139–41 (2016). (emphasis added).

[21] 793 F.2d 969 (9th Cir. 1984).

fairness of special education placements (e.g., *Larry P. v. Riles*, 1979), concerns with nonbiased assessment (Oakland, 1977), changes in federal laws (e.g., PL 94-142), and changes in how mental retardation is defined.[22]

These findings are cited, not to say that IQ tests like the one administered here are flawed or defective, but rather to note that basing an individual's ability to parent on a single intelligence test is a systemic injustice that must be addressed.

Mental capacity should not be the sole determinant of one's ability to parent. Research suggests that parents who have been labeled as mentally disabled, can overcome deficits in their parenting with training and services. The impact of an individual's developmental disability on his/her ability to parent varies from person to person. Standardized testing or a brief psychological evaluation may not extrapolate all of the strengths and resources possessed by the individual. Parenting ability is a complex set of variables that cannot be reduced to a simple intelligence test. It is imperative that evaluators asked to determine the parenting capabilities of an individual observe the parent and child together over extended periods of time. The evaluator must look at the relationship and interactions of the parent and child to make a valid recommendation.[23]

It has been said that the termination of parental rights is of such gravity that it is the civil version of the death penalty. While some may disagree, there

---

[22] Timothy Z. Keith, Paul G. Fehrmann, Patti L. Harrison, Shelia M. Pottebaum, *The Relation Between Adaptive Behavior and Intelligence: Testing Alternative Explanations*, Journal of School Psychology, 25(1), 31-43 (1987). (emphasis added).

[23] Jennifer A. Culhane, *A Challenge of California Family Code Section 7827: Application of This Statute Violates the Fundamental Rights of Parents Who Have Been Labeled Mentally Disabled*, 3 Whittier J. Child & Fam. Advoc. 131, 142 (2003).

is a pertinent and obvious parallel to the line of cases where the intellectual functioning of a person subject to the death penalty is concerned. In *Woodall v. Commonwealth*,[24] this Court said:

> In an attempt to provide guidance to courts confronting this issue, we shall attempt to fashion a rule. The U.S. Supreme Court in *Moore*[25] favorably viewed what appears to be the "generally accepted, uncontroversial intellectual-disability diagnostic definition," akin to a totality of the circumstances test, and what KRS 532.130(2) seemingly reflects, "which identifies three core elements: (1)intellectual-functioning deficits (indicated by an IQ score 'approximately two standard deviations below the mean'—i.e., a score of roughly 70—adjusted for the 'standard error of measurement'; (2) **adaptive deficits**[26] ("the inability to learn basic skills and adjust behavior to changing circumstances,); and (3) the onset of these deficits while still a minor."

The same thing is being measured here. It is clear error to make a finding of intellectual disability without a measurement of adaptive ability, building a house of cards on speculation as to the risk of some future neglect or abuse. The Kenton Family Court terminated K.S.'s parental rights not based on any behavior of K.S. against her child, but on the conjecture of her perceived inability to parent because of her performance on a single IQ test. This insufficient analysis for persons with intellectual delays is outdated and is insufficient evidence upon which to base a termination of parental rights.

---

[24] 563 S.W.3d 1, 4 (Ky. 2018). (emphasis added).

[25] *Moore v. Texas*, 137 S.Ct. 1039 (2017).

[26] Emphasis added.

45

## The Cabinet must comply with the Americans with Disabilities Act

Here, the Cabinet was aware from the moment that K.S. asked for help with her newborn that she had a mild form of autism called Pervasive Developmental Disorder. Yet it failed to abide by the Americans with Disabilities Act (hereafter, ADA) by not providing her with services appropriate to her diagnosis. Pursuant to 42 U.S. Code § 12131 (1)(A)-(B), the Cabinet is subject to the Americans with Disabilities Act as a public entity. In *Marble v. Tennessee*,[27] the United States Court of Appeals, Sixth Circuit, opened its discussion regarding a father's claim against the Tennessee Department of Children's Services focusing on Title II of the ADA, stating: "Under Title II of the Americans with Disabilities Act (ADA) and its implementing regulations, public entities are required to make reasonable modifications in their provision of service to avoid discriminating against disabled individuals." *Id.* at 649. The *Marble* opinion goes on to determine that a public entity may be guilty of discrimination, under the ADA, through failure to make reasonable accommodations in their policies and procedures for individuals with disabilities.

> Title II states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132. The statute defines "public entity" as any state or local government, including

---

[27] 767 Fed.Appx. 647 (6th Cir. 2019).

departments and agencies. *Id.* § 12131 (1)(A)-(B). The term "services, programs, or activities" has been construed broadly, capturing "virtually everything that a public entity does." *Babcock v. Michigan,* 812 F.3d 531, 540 (6th Cir. 2016). Although the test of Title II does not define "discrimination," we have generally recognized two methods for proving discrimination: intentional discrimination and failure to make reasonable accommodation. *McPherson v. MHSAA,* 119 F.3d 453, 460 (6th Cir. 1997). The latter method stems from a regulation implementing Title II: "A public entity shall make reasonable modifications in policies, practices, or procedures when the *modifications are necessary to avoid discrimination on the basis of disability,* unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).[28]

The ADA was enacted to protect individuals with disabilities, and unfortunately, stories like that of K.S. have occurred across this country for far too long. The Department of Justice and the Department of Health and Human Services investigated a 2012 Massachusetts case of discrimination and conjecture regarding a mother with a developmental disability who likewise demonstrated difficulty in feeding and diapering her newborn:

> Reliance on unwarranted assumptions about Ms. Gordon's developmental disability is precisely the sort of an outdated approach that the ADA and Section 504 were enacted to prohibit. *See* 28 C.F.R. pt. 35, App. B (providing in 1991 preamble to the Title II regulation that the provisions in 28 C.F.R Section 35.130(b) are,

---

[28] *Id.* at 650-651. (emphasis added).

47

"taken together, . . . intended to prohibit . . . the denial of equal opportunities enjoyed by others, based on, among other things, presumptions, patronizing attitudes, fears, and stereotypes about individuals with disabilities. Consistent with these standards, *public entities are required to ensure that their actions are based on facts applicable to the individuals and not on presumptions as to what a class of individuals with disabilities can or cannot do.*" As explained below, however, DCF did not implement appropriate services and supports, denying her an opportunity to benefit from DCF's reunification program.[29]

The facts underling the case of Ms. Gordon are eerily similar and cited below.

In November 2012, Sara Gordon, a then 19-year-old woman with an intellectual disability, gave birth to her daughter, Dana. Two days after giving birth, while still in the hospital, the Gordon family was referred to the Massachusetts Department of Children and Families (hereinafter "DCF") due to allegations of neglect. During an emergency investigation, DCF observed that Sara experienced difficulties with feeding and diapering her newborn. Thereafter, DCF asserted that Sara was not able to adequately care for her daughter owing to Sara's intellectual disability. Dana was then placed in foster care.

Sara's battle to be reunited with her daughter ensued for two years, three months, and 12 days. During this time, Sara was only allowed to visit with Dana one time per week for one hour. Trying to demonstrate her fitness to raise her daughter, Sara successfully completed numerous parenting education classes. Sara was also evaluated by a psychologist skilled at assessing the capabilities of parents with intellectual

---

[29] U.S. Department of Justice, Civil Justice Division letter re: *Investigation of the Massachusetts Department of Children and Families by the United States Departments of Justice and Health and Human Services Pursuant to the Americans with Disabilities Act and the Rehabilitation Act (DJ No. 204-36-216 and HHS No. 14-182176)*, (January 2015), https://www.ada.gov/ma_docf_lof.pdf (emphasis added).

disabilities, who determined that with appropriate supports, including Sara's family, which was committed to supporting the mother and daughter, Sara could safely care for Dana. Nonetheless, DCF changed the permanency goal, which determines whether the family will be reunited or permanently separated, from reunification to adoption. In January 2015, the Department of Justice and Department of Health and Human Services issued a joint letter of findings, holding that DCF violated both Section 504 of the Rehabilitation Act (hereinafter "Section 504") and Title II of the Americans with Disabilities Act (hereinafter "ADA") by (1) acting based on assumptions about Sara's ability to care for her daughter rather than conducting an individualized assessment of her needs; (2) failing to provide Sara supports and services toward reunification; (3) refusing to recognize Sara's continued engagement and progress; and (4) failing to develop and implement appropriate policies and practices concerning the agency's legal obligations vis-à-vis disability civil rights laws. Two months later, Sara and Dana were reunited.

Tragically, the heartbreaking story of Sara and Dana is not unique or uncommon. Each day, parents with intellectual disabilities contend with prejudicial child welfare policies and practices that are based on the presumption that they are unfit to raise their children. According to the National Council on Disability, an independent federal agency that advises the President and Congress on policies affecting people with disabilities, "the rate of removal of children from families with parental disability--particularly psychiatric, intellectual, or developmental disability--is ominously higher than rates for children whose parents are not disabled. And this removal is carried out with far less cause, owing to specific, preventable problems in the child welfare system."

In his groundbreaking Harvard Law Review article, *Presumptions of Justice: Law, Politics, and the Mentally Retarded Parent,* Professor Hayman posited that the presumption that parents with intellectual disabilities are unfit "is both unjust and empirically invalid." To argue his assertion, Hayman used the extant scientific studies--which at the time, were

> scarce--to demonstrate that parents with intellectual disabilities are not inherently unfit.
>
> As Sara Gordon's story illustrates, more than two decades since Hayman authored his article, little has changed in terms of how the child welfare system or law treats parents with intellectual disabilities. Nonetheless, there now is a sizable and growing body of scientific evidence relative to parents with intellectual disabilities and the wellbeing of their children.[30]

Judges often rely heavily on parenting evaluations and yet no such evaluation was admitted into evidence in this case.[31] In the dependency case the Cabinet recommended that something called an "Adaptive Parenting Assessment" be obtained via Edward Connor, Psy.D. This report was filed on May 8, 2017, before the filing of the termination. However, the form order signed by the judge did not incorporate that recommendation and the recommendation was stricken through by the Court and initialed. However, when reading the report referenced, it appears that the "adaptive parenting assessment" would have included an analysis of the foster parents' abilities and that is not part of the initial individual assessment of the biological parent that has to form the foundation of this case.

---

[30] Robyn M. Powell, MA, JD, *Safeguarding the Rights of Parents with Intellectual Disabilities in Child Welfare Cases: The Convergence of Social Science and Law*, 20 CUNY L. Rev. 127, 127–29 (2016).

[31] Apparently, a Comprehensive Assessment and Training Services (CATS) assessment was done in the underlying Dependency, Neglect and Abuse case but the report was not entered into evidence during the subsequent termination trial. No witness was called by the Cabinet who could properly submit to cross-examination and the trial court, after an objection, ruled that the report could not come into evidence.

Individualized assessments for parents with disabilities are not new trends. In 2015, the U.S. Department of Justice and Department for Health and Human Services addressed how state agencies and court systems should comply with the ADA when parenting evaluations are needed.

> An individualized assessment is a fact-specific inquiry that evaluates the strengths, needs, and capabilities of a particular person with disabilities based on objective evidence, personal circumstances, demonstrated competencies, and other factors that are divorced from generalizations and stereotypes regarding people with disabilities. Child welfare agencies and courts may also be required to provide reasonable modifications to their policies, practices, or procedures and/or appropriate auxiliary aids and services during assessments to ensure equal opportunities for individuals with disabilities.[32]

On May 4, 2017, the General Assembly of the State of South Carolina took a substantial step in implementing protections for parents with disabilities. The General Assembly passed, and the Governor signed into law the "Persons with Disabilities Right to Parent Act" codified in Section 63-21-20. 63-21-20 (B)(1) mandates that the department[33] shall:

> (a) Make reasonable efforts, that are individualized and based upon a parent's or legal guardian's specific disability, to avoid removal of a child from the home

---

[32] U.S. Dep't of Health and Human Serv. & U.S. Dep't of Justice, *Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, ADA,* (August 2015), https://www.ada.gov/doj_hhs_ta/child_welfare_ta.html

[33] South Carolina Department of Social Services.

of a parent or legal guardian with a disability, including referrals for access to adaptive parenting equipment, referrals for instruction on adaptive parenting techniques, and reasonable accommodations with regard to accessing services that are otherwise made available to a parent or legal guardian who does not have a disability;

(b) Make reasonable accommodations to a parent or legal guardian with a disability as part of placement and visitation decisions; preventative, maintenance, and reunification services; and evaluations or assessments of parenting capacity.

The Adoption and Safe Families Act of 1997 requires the state to file a petition to terminate parental rights when a child has been out of the home for 15 of the last 22 months, or the child is determined to be an abandoned infant, as defined by state law; or the parent has committed or been involved in murder, voluntary manslaughter, or felonious assault of one of his or her children. However, there are some few exceptions to the application of the 15 out of 22 month rule, which includes where the state agency has not provided the services required by the case plan.

Here, the Cabinet delays were significant, and the Cabinet admits that there was a gap of services to K.S. of at least one year and that no efforts were made to accommodate her developmental delays until at least after January of 2017. It was then that a former teacher of K.S. who is also an autism advocate stepped forward to try to get the Cabinet to restart its efforts and to educate them on services that were available to assist K.S. During the trial, Kevin Minch, Family Services Supervisor with the Cabinet for Health and Family

52

Services, testified that in January 2017, after the yearlong lapse in services, the autism advocate provided cabinet workers with information regarding additional services for K.S. Minch further testified that until that point no services relating to Autism or developmental delays had been offered. Moreover, Minch noted that it was his belief that there were services that could benefit K.S. and improve her ability to parent. Regardless, less than six months later, the Cabinet instead initiated termination of her parental rights.

At trial, the advocate, who has known K.S. for several years testified that K.S. was very bright and "high-functioning." And Kevin Minch, the social worker, testified that K.S. was pleasant and cooperative and was not able to point to a single inappropriate or risky incident that arose in any of the visits between K.S. and her child.

CONCLUSION

Throughout the entire termination of parent rights hearing, and appellate process K.S. has repeatedly raised the issue that the Cabinet failed to provide adequate services due to her disability. Because the Cabinet has failed to provide services appropriate to K.S.'s disability under the ADA and because the Court clearly erred in relying on insufficient evidence of intellectual disability as provided by Dr. Rosenthal, the termination of K.S.'s parental rights should be vacated and the Court of Appeals decision should be affirmed. We are not, as the concurring opinion states, "too far down the road to 'fix' this case." We can and should rewind the dependency case to the beginning and require the

53

Cabinet to follow the Americans with Disabilities Act and finally provide assessments and reasonable services to this family.

Wright, J., joins.

WRIGHT, J., DISSENTING: I respectfully dissent. While I agree with Justice Lambert's well-written separate dissenting opinion, I write to briefly note some additional reasons I disagree with the majority opinion. Here, as the majority notes, the family court needed to rely on clear and convincing evidence in terminating K.S.'s parental rights. However, the court's decision was not based on such evidence.

As the majority states in its opinion, the social worker in this case, Minch, "was unaware of all services offered to K.S. beginning in January 2017 . . . ." What is known is that no services related to K.S.'s specific disabilities were offered until that time. How, if no testimony was provided as to the specific services provided to K.S., could the trial court find by clear and convincing evidence that appropriate reunification services had been rendered? Clearly, it could make no such determination on a silent record.

Furthermore, it is extremely troubling that the assessment by Dr. Connor was not performed in this case. The only testimony on this matter also came from Minch. He indicated that K.S.'s autism advocate had withdrawn K.S.'s consent to this assessment. That makes no legal sense. There is no indication that K.S. has a legal guardian or that the advocate was such. Nor is there any indication that the advocate had a power of attorney giving her K.S.'s legal rights to make such a withdrawal of consent. How, then, could this

"revocation" bind K.S.? It cannot. Without such an individual assessment, the trial court did not have ample evidence on which to base its revocation of parental rights. K.S. was never asked if she withdrew her consent to the assessment. During the trial, the Cabinet's attorney failed to question K.S. at all regarding the proposed assessment.

The sole medical evidence upon which the trial court based its revocation order was that of Dr. Rosenthal. Dr. Rosenthal's only medical finding was that K.S. did not exhibit any signs of autism, but that her I.Q. of 65 placed her in the category of having a mild intellectual disability. This sets an unconscionable precedent: that the *only* evidence needed to deprive a parent of the fundamental right to rear her children that she has an I.Q. placing her within the category of intellectually disabled—no matter how mild that disability may be or what impact it has on her ability to parent. That is not in line with the statutory requirements for termination of parental rights and should not be acceptable precedent for this Court to set in the Commonwealth.

I point to the Supreme Court of the United States' holding in *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 600 (1999). That Court held that individuals for whom placement would be beneficial were entitled to placement in community-based treatment centers. "The holding in *Olmstead,* however, has also been applied to individuals who live at home but are in need of community-based services . . . ." *Michelle P. ex rel. Deisenroth v. Holsinger,* 356 F. Supp. 2d 763, 769 (E.D. Ky. 2005). In *Michelle P.,* several intellectually disabled individuals sought to have Kentucky's Cabinet for Health and Family

55

Services (the same Cabinet which is the Appellant herein) provide them with prompt access to community-based treatment centers. *Id.* at 767.

While those cases were based upon Medicare regulations and other healthcare laws, under section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990 should extend that entitlement to prompt services such as community-based treatment to individuals such as K.S. in this case. Here, K.S. was told that her living situation with her parents was not acceptable for her to have her son returned to her care. However, the Cabinet provided no options for K.S. such as a community-based treatment facility. Her parental rights were ultimately terminated based upon her inability to obtain services on her own to which she was otherwise entitled. That is unacceptable.

K.S. was denied services to which she was entitled for years. Shortly after they were considered—and without any additional assessment of her ability to parent her child—K.S.'s parental rights were terminated. For all the reasons in Justice Lambert's dissenting opinion and those outlined herein, I dissent and would affirm the result of the Court of Appeals' order vacating the family court's revocation of K.S.'s parental rights.

Lambert, J., joins.

COUNSEL FOR APPELLANT, COMMONWEALTH OF KENTUCKY, CABINET FOR HEALTH AND FAMILY SERVICES:

Mona Sabie Womack
Abigail Voelker
Cabinet for Health and Family Services
Office of Legal Services

COUNSEL FOR APPELLANT, A.W.S., A CHILD:
James Richard Scott


COUNSEL FOR APPELLEE, K.S., MOTHER:

George Andrew Thompson